```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
J.M. and M.M.,                                              :
                                  Plaintiffs,               :
                                                            :   21 Civ. 6958 (LGS)
                -against-                                   :
                                                            :   OPINION AND ORDER
                                                            :
UNITED HEALTHCARE INSURANCE,                                :
UNITED BEHAVIORAL HEALTH, and the                           :
CREDIT SUISSE SECURITIES (USA) LLC                          :
GROPU HEALTH CARE PLAN,                                     :
                                  Defendants.               :
------------------------------------------------------------X
```

LORNA G. SCHOFIELD, District Judge:

Plaintiffs J.M. and M.M. commenced this action against Defendants Credit Suisse Securities (USA) LLC Group Health Care Plan (the "Plan"), United Healthcare Insurance Company and United Behavioral Health, to challenge M.M.'s request for health benefits under the Plan. Plaintiffs assert two claims respectively under the Employee Retirement Income Security Act ("ERISA") and the Mental Health Parity and Addiction Equity Act of 2008 (the "Parity Act"). The parties filed cross-motions for summary judgment. For the following reasons, Defendants' motion for summary judgment is granted. Plaintiffs' motion for summary judgment is denied as moot.

I. BACKGROUND

The following summary is taken from the parties' statements pursuant to Local Civil Rule 56.1 and other filings on these motions. The facts are either undisputed or based on evidence in the administrative record.

A. The Parties and the Plan

Plaintiff J.M., a participant in the Plan, is Plaintiff M.M.'s father. At the time of the events at issue, Plaintiff M.M. was an adolescent and a covered beneficiary under the Plan. The

Plan is a self-funded employee welfare benefits plan regulated under ERISA. The Plan Administrator is the Credit Suisse Benefits Committee (the "Benefits Committee"). The claims administrator for the Plan is United Healthcare Services, Inc., which delegated claims administration for mental health benefits to Defendant United Behavioral Health. Defendants assert that Plaintiffs incorrectly named United Healthcare Insurance Company rather than United Healthcare Services, Inc. as the claims administrator defendant. Because that distinction does not affect the outcome, United Healthcare Insurance Company, United Healthcare Services, Inc. and United Behavioral Health are collectively referred to below as "United."

The Plan provides that "[a]ll covered services, except routine circumcision and preventive health services, must be medically necessary for you." The Plan requires that, "[t]o be covered, a medical service must be 'medically necessary' as determined by a physician and agreed to by the claims administrator." The medical necessity requirement means, among other conditions, that the care must be "[c]onsistent with the diagnosis and treatment of your condition and in accordance with the claims administrator's medical policy and medical technology assessment guidelines" and "[f]urnished in the least intensive type of medical care setting required by your medical condition." The Plan expressly excludes from coverage "[c]harges for confinement in a place that is primarily a school or a place of rest."

**B.      The Basis for the Lawsuit**

The parties dispute whether Plaintiffs are entitled to health benefits for mental health care M.M. received at two residential treatment facilities -- Elevations RTC ("Elevations") and Daniels Academy. M.M. sought mental health treatment for autism spectrum disorder, attention deficient hyperactive disorder ("ADHD"), obsessive-compulsive disorder ("OCD") and anxiety. M.M. received mental health services at Elevations from February 25 to May 24, 2019.

Immediately thereafter, M.M. received mental health services at Daniels Academy from May 26, 2019, to May 21, 2021.  Defendants covered the first eighteen days of M.M.'s treatment at Elevations, through March 14, 2019, but discontinued coverage on the ground that continued residential treatment was not medically necessary.  Defendants did not cover any portion of M.M.'s treatment at Daniels Academy.

### C. Procedural History

In 2019, Plaintiffs instituted two first-level appeals with United, as claims administrator, appealing the denial of coverage at Elevations and Daniels Academy, respectively.  United upheld both denials based on the 2019 Optum Level of Care Guidelines ("Optum Guidelines"). In 2019 and 2020, Plaintiffs instituted two second-level appeals to the Benefits Committee for the denial of coverage at the two residential treatment programs, respectively.  In 2020, the Benefits Committee affirmed United's denials, finding that M.M.'s residential treatment from March 15, 2019, forward was not medically necessary.

Having exhausted their prelitigation appeal obligations under ERISA, Plaintiffs filed this lawsuit in the District of Utah on March 12, 2021, then stipulated to transfer the action to this Court in August 2021.  In December 2021, the case was remanded to the pre-litigation appeal process for further consideration following Defendants' production of additional documents.

On remand, Plaintiffs instituted two appeals regarding United's denial of coverage at Elevations and Daniels Academy, respectively.  United again upheld the denial of coverage on the two first-level remand appeals.  The Benefits Committee upheld the denial of coverage on the second-level remand appeal in a single decision on November 4, 2022 (the "Final Appeal Denial").  During the appeals on remand, Defendants used a tool called the Child & Adolescent Level of Care / Service Intensity Utilization System for Children and Adolescents Ages 6-18

("CASII"), developed by professionals using an evidence-based approach, to evaluate whether M.M.'s mental health treatment was medically necessary.

## II. DISCUSSION

### A. ERISA (First Cause of Action)

For the following reasons, Defendants' motion for summary judgment on the ERISA claim for recovery of benefits is granted. Plaintiffs' cross-motion on the same claim is denied as moot.

#### 1. Standard of Review

Under ERISA, "[a] civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Federal courts review a Plan Administrator's denial of benefits de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case an arbitrary and capricious standard applies." *Halo v. Yale Health Plan, Dir. of Benefits & Recs. Yale Univ.*, 819 F.3d 42, 51 (2d Cir. 2016).[1] "The plan administrator bears the burden of proving that the deferential standard of review applies." *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002); *accord Munnelly v. Fordham Univ. Fac.*, 316 F. Supp. 3d 714, 726 (S.D.N.Y. 2018).

Here, review is under the arbitrary and capricious standard because the Plan grants the administrator discretionary authority to construe the terms of the Plan. The Plan provides the Benefits Committee or its delegate with "discretionary authority to determine . . . any and all questions arising from or relating to the administration and interpretation of the plan" including

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, emphases, footnotes and citations are omitted.

4

the authority to determine "eligibility for benefits, the relevant facts, and the amount and type of benefits payable." Decisions by the Benefits Committee "will be final, conclusive and binding on all parties claiming to have an interest under the Plan and not subject to further review."

"[D]enials may be overturned as arbitrary and capricious only if the decision is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Fay*, 287 F.3d at 104; *accord Munnelly*, 316 F. Supp. 3d at 726. "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and . . . requires more than a scintilla but less than a preponderance." *Celardo v. GNY Auto. Dealers Health & Welfare Tr.*, 318 F.3d 142, 146 (2d Cir. 2003); *accord Nall v. Hartford Life & Accident Ins. Co.*, No. 22-49-CV, 2023 WL 2530456, at *1 (2d Cir. Mar. 16, 2023) (summary order). A district court's review under the arbitrary and capricious standard is generally limited to the materials in the administrative record. *See S.M. v. Oxford Health Plans (N.Y.)*, 644 F. App'x 81, 84 (2d Cir. 2016) (summary order).

Despite this authority, "a plan's failure to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503-1, will result in that claim being reviewed de novo in federal court, unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent and harmless." *Halo*, 819 F.3d at 57-58. Plaintiffs contend that Defendants violated the claims procedure regulations under 29 C.F.R. § 2560.503-1(g) to (h) by failing to explain sufficiently their bases for denying Plaintiffs' claims, including references to the terms of the Plan or Defendants' internal guidelines.

The applicable regulations, as relevant here, require the following explanations: (1) the reason for the adverse determination, (2) reference to the relevant plan provision and (3) for a

5

medical necessity requirement in a group health plan such as the Plan:

> If the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request.

29 C.F.R. § 2560.503-1(g)(1). "[C]ourts commonly review the entirety of communications between a beneficiary and a plan administrator in assessing whether an administrator substantially complied with ERISA's notice requirements." *Munnelly*, 316 F. Supp. 3d at 739 (collecting cases).

Defendants satisfied these requirements. First, the Final Appeal Denial, and all the prior appeal decisions, state the reason for the adverse determination: that M.M.'s continued residential treatment at Elevations and Daniels Academy was not medically necessary. Second, the Final Appeal Denial and several of the prior denials reference a relevant Plan provision. For example, the Final Appeal Denial states: "[a]s described in the Credit Suisse Group Health Care Plan Summary Plan Description, for treatment services to be covered, the treatment must be deemed medically necessary." Each of the Benefits Committee second-level appeal decisions references the Plan's requirement of medical necessity for treatment to be covered.

Finally, Defendants provided "an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances." 29 C.F.R. § 2560.503-1(g)(1)(v)(B). The Final Appeal Denial states that the decision was based on the clinical judgment of an independent medical physician who applied the CASII guidelines to conclude that residential treatment during the relevant period was not medically necessary. The two first-level remand appeal decisions elaborate. They identify M.M.'s diagnoses, explain how each condition did not interfere with M.M.'s functioning, did not require 24/7 treatment and

could have been treated with individual therapy in an outpatient setting. The decisions explain that, based on the CASII guidelines, outpatient mental health was indicated and M.M. did not need residential treatment. The decisions provide a link to general information about the guidelines and offer a copy of the specific guideline used for the decision free of charge.

Contrary to Plaintiffs' argument, Defendants were not required to engage with the opinions of M.M.'s treating professionals. *See Nall*, 2023 WL 2530456, at *2 ("[T]he Supreme Court has rejected the notion that administrators must defer to statements by treating physicians."). As Defendants complied with the claims-procedure regulations, the arbitrary and capricious standard of review applies.

### 2. CASII Guidelines to Determine if Treatment is "Medically Necessary"

As detailed above, the Plan provides compensation only for treatment that is "medically necessary." Defendants used a tool called CASII on the remand appeals to evaluate whether M.M.'s mental health treatment was medically necessary. They concluded that Plaintiff M.M. did not need residential mental health treatment, which is Level Five care under the CASII guidelines. Plaintiffs disagree and argue that M.M. needed this level of care, which he received at Elevations and Daniels Academy.

CASII sets out seven levels of service intensity, from the least intensive "Level Zero: Basic Services for Prevention and Maintenance" to the most intensive "Level Six: Secure, 24-Hour Services with Psychiatric Management." CASII instructs the reviewer to estimate the appropriate level of service intensity based on six dimensions, each of which is rated one to five based on various criteria, also called anchor points, described in the tool. The six dimensions CASII evaluates are the (1) child's risk of harm to self or others; (2) child's functional status including the ability to engage in developmentally appropriate activities of living; (3) child's

7

coexisting developmental, medical, substance use and psychiatric conditions; (4) child's environmental stress and environmental support; (5) history of the child's resiliency and response to services and (6) engagement of the adolescent and primary caregiver in services.

CASII states that "[o]nly one of the anchor points in a severity level needs to be met for a score to be assigned for that dimension." CASII instructs the evaluator to "select the highest score or rating in which at least one of the anchor points is met" and err "on the side of caution" by selecting the "highest score in which it is more likely than not that at least one anchor point has been met" if it is unclear which rating fits best.

The second highest level of service intensity, "Level Five: Non-Secure [i.e., unlocked], 24-Hour Services with Psychiatric Monitoring," provides 24-hour care in a non-hospital setting, such as a residential treatment facility. A composite score of twenty-three to twenty-seven is needed to meet this service level intensity, although a score of four in any of the risk of harm, functional status or coexisting conditions dimensions -- regardless of the composite score -- will also qualify a child for Level Five care. Under CASII, Level Five care is automatically warranted when the child (1) poses a "serious risk of harm" (e.g., has behaviors that are "significantly endangering to self or others"), (2) experiences "serious functional impairment" (e.g., has "[s]erious deterioration of interpersonal interactions," "[s]ignificant withdrawal and avoidance of almost all social interaction," "[s]erious disturbances in vegetative status, such as weight change, disrupted sleep or fatigue . . . which threaten physical functioning") or (3) has "major co-occurrence" (e.g., "[p]sychiatric symptoms are present that clearly impair functioning, persist in the absence of stressors, and seriously impair recovery from the presenting problem").

A composite score of twenty to twenty-two is needed to meet the next highest level of service intensity, "Level Four: Intensive Integrated Services Without 24-Hour Psychiatric

Monitoring."  CASII services under Level Four include "partial hospitalization" and intensive outpatient programs.  Intensive outpatient programs can include treatment several times a week with additional support services.  Level Four care is warranted when, among other possible criteria, the child (1) poses a "significant risk of harm" (e.g., has behaviors that are "moderately endangering to self or others"), (2) experiences "moderate functional impairment" (e.g., "[c]onflicted, withdrawn, or otherwise troubled in relationships with peers, adults, and/or family, but without episodes of physical aggression," "[c]hronic and/or variably severe deficits in interpersonal relationships," "[r]ecent gains and/or stabilization in functioning have been achieved while participating in services in a structured, protected, and or/ enriched setting") or (3) has "significant co-occurrence" (e.g., "[p]sychiatric signs and symptoms are present and persist in the absence of stress, are moderately debilitating, and adversely affect the presenting problem").

### 3. M.M.'s Treatment at Elevations

Substantial evidence supports Defendants' decision to deny coverage for M.M.'s treatment at Elevations from March 15 to May 24, 2019.  The Plan excludes from coverage "[c]harges for confinement in a place that is primarily a school or a place of rest."  The Plan does provide "coverage for medically appropriate behavioral health treatment provided in a Residential Treatment Facility" but notes that "[c]ertain criteria must be met in order to qualify for coverage, including evidence that the treatment is medically appropriate based on severity of illness and risk factors."

Plaintiffs' first appeal on remand regarding M.M.'s treatment at Elevations was reviewed by Dr. Randall Solomon, United's Behavioral Medical Director who is certified by the American Board of Psychiatry and Neurology and American Board of Addiction Medicine.  Dr. Solomon

9

addressed the six dimensions of CASII and each of M.M.'s diagnoses before concluding that M.M.'s conditions warranted only intensive outpatient program services, which include treatment from nine to nineteen hours per week, rather than Plaintiffs' requested coverage for around-the-clock services at a residential treatment facility.  Dr. Solomon calculated a CASII score of eighteen for the period of M.M.'s treatment at Elevations.  Dr. Solomon noted that M.M. was "getting out of bed in the mornings and going to all activities" and that the issues that had apparently caused M.M. to fail out of boarding school in the fall of 2018 were "no longer present."  Dr. Solomon also noted that M.M.'s treatment goals "could be achieved with outpatient individual psychotherapy" because his "condition was stable and demonstrated minor difficulties."  Dr. Solomon wrote that M.M. had been responding well to treatment and his medications "were adequate."  He noted "no safety issues and there was no indication of a functional limitation that would require extensive treatment" and "no indications that the member requires 24/7 supervision at a Residential Level of Care."

Similarly, the Final Appeal Denial was based on a review by the Medical Review Institute of America (the "MRIoA Review").  The review report explains that "there were no acute symptoms documented that could not be addressed at lower level of care" and that M.M. "was very compliant and engaged in treatment" in his time at Elevations.  The MRIoA Review found that continued residential treatment was not medically necessary because although M.M.'s anxiety and OCD "affected some of his functioning," he could have received "[s]imilar support therapy services and medication management . . . at a lower level of care."  M.M. was not "experiencing other psychiatric symptoms, such as severe worsening anxious or depressed mood symptoms, psychosis, or behavior affecting his ability to fully participate in treatment," so continuing residential treatment was not medically necessary.  The MRIoA Review was

conducted by an independent physician who was certified by the American Board of Psychiatry & Neurology in General Psychiatry.

The administrative record supports Defendants' findings that M.M.'s residential treatment at Elevations was not medically necessary and could have been managed at a lower level of care. Plaintiffs argued that M.M. met the CASII Level Five standard for residential treatment at Elevation based on ratings of four for "Serious Risk of Harm," four for "Serious Functional Impairment," four for "Major Co-Occurrence," three for "Moderate Recovery Environment" and four for "Minimally Supporting Environment," four for "Poor Resilience and/or Response to Service," and three for "Child's Limited Involvement in Services" and two for "Parent's Adequate Involvement in Services." Plaintiffs argued that M.M. should have been rated four for serious risk of harm, automatically requiring Level Five care, due to his "significant impulsivity and sexual aggression," "consistent deficits in his inability to care for himself" and "danger to himself." However, substantial evidence supports the finding that M.M. did not pose a significant danger to himself or anyone else. While M.M. at times made highly inappropriate conversation and excessively washed his hands due to his OCD, nothing in the administrative record suggests that M.M. might have physically acted on his conversation topics or that his handwashing significantly endangered him.

Similarly, the record supports Defendants' rejection of Plaintiffs' rating of four for serious functional impairment. Defendants reasonably found that M.M.'s symptoms adopted a rating of three, matching the moderate functional impairment criteria of "[c]hronic and/or variably severe deficits in interpersonal relationships," and "[c]onflicted, withdrawn, or otherwise troubled in relationships with peers, adults, and/or family, but without episodes of physical aggression," rather than the serious functional impairment criterion of "[s]ignificant

11

withdrawal or avoidance of almost all social interaction," which would require Level Five care. M.M.'s medical records during his time at Elevations reflect numerous instances in which he participated in conversations with students and staff.

Plaintiffs also argued that M.M. should have been rated four for major co-occurrence of conditions due to his primary condition of autism spectrum disorder, a developmental disability, and his co-occurrence of ADHD, a psychiatric disorder, and OCD, a medical condition. However, Defendants reasonably adopted a rating of three, such that, pursuant to the CASII Appendix for Co-Occurrence of Conditions, M.M.'s OCD "may adversely affect, or be adversely affected by" (rather than "will adversely affect") his primary condition, and the ADHD is "moderately debilitating" rather than "clearly impair[ing] functioning.

Thus, substantial evidence supports Defendants' denial of coverage for M.M.'s continued treatment at Elevations because the administrative record includes evidence "a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker." *See Nall*, 2023 WL 2530456, at *1; *Julie L. v. Excellus Health Plan, Inc.*, 447 F. Supp. 3d 38, 49 (W.D.N.Y. 2020) (reasonableness of denial confirmed by external review); *S.M.*, 644 F. App'x at 84 (same).

### 4. M.M.'s Treatment at Daniels Academy

Substantial evidence also supports Defendants' denial of coverage for M.M.'s treatment at Daniels Academy from May 26, 2019, to May 21, 2021.

Upon M.M.'s admission, Daniels Academy prepared an initial treatment plan which explained that "Daniels Academy will assist [M.M.] in managing his anxiety and improving his social skills. This will enable him to do well in his schooling and find greater autonomy as he moves toward adulthood, gain a sense of competence in the areas that are important to him and

important for his future, and experience relationships that are mutually enjoyable."  Similar social goals are included in a "Therapeutic Adventure Individual Program Plan," in which M.M.'s parents stated that they would like M.M. "to develop an understanding of his metacognition, his identity as a person with Asperger's in this world . . . [to] develop his social skills, executive functioning skills, and independent living skills," and "to develop his ability to recognize[] and manage the things that will increase his anxiety and manifest in OCD.  Most of all, we'd like [M.M] to develop meaningful friendships."

Monthly reports from Daniels Academy noted M.M.'s progress in his treatment.  While some reports noted passive suicidal ideation, they did not indicate intent, plan or serious self-harm urges.  A physician's note the day after M.M. mentioned passive suicidal thoughts reported no suicidal ideation, suicidal intent, homicidal ideation, self-harm or self-harm urges.  *See Jon N. v. Blue Cross Blue Shield Mass., Inc.*, 684 F. Supp. 2d 190, 204 (D. Mass. 2010) (not arbitrary and capricious to deny coverage for residential treatment facility where records indicated that claimant was "stable" and "not homicidal, suicidal, or a danger to herself or others"); *accord Julie L.*, 447 F. Supp. 3d at 49.  While at Daniels Academy, M.M. went on multiple trips home to see his family and took a two-week trip to Hawaii with his family, suggesting that M.M. could have managed his symptoms at a lower level of care with the support of his family.  *See Julie L.*, 447 F. Supp. 3d at 50 (plaintiff's trips with his family at a therapeutic boarding school "could reasonably be interpreted as evidence that Q.M., with the support of his family, could have managed his symptoms at a lower level of care").

The reasonableness of Defendants' denial is confirmed by multiple reviews, which upheld the coverage denial.  For instance, on remand, the first-level appeal was reviewed by Dr. Solomon, who determined based on CASII that M.M. did not warrant Level Five care.  He

calculated a CASII score of twelve for the period of M.M.'s treatment at Daniels Academy Review. Dr. Solomon noted that M.M.'s "ADHD did not need 24/7 supervision," and his "OCD symptoms were hand washing and a fear of germs," which "did not interfere with [his] functioning" and "could have been treated at home with Outpatient Level of Care with individual therapy." Similarly, the MRIoA Review, the basis for the Final Appeal Denial, explains that M.M. "was not exhibiting any acute psychiatric symptoms, that could not be addressed in a less restrictive environment or a lower level of care" and that M.M. "remained free of thought of self-harm, engaged in treatment, with no abnormal behavior that would require" care in a residential treatment facility. The MRIoA Review also notes that Daniels Academy was a "structured teaching environment, which is not considered an acute psychiatric indication for which 24 hour monitoring would be required."

Other parts of the administrative record also support Defendants' findings that M.M. could have been managed at a lower level of care during his time at Daniels Academy. Plaintiffs argued that M.M. met the CASII Level Five standard for residential treatment at Daniels Academy based on ratings of four for "Serious Risk of Harm," four for "Serious Functional Impairment," four for "Major Co-Occurrence," three for "Moderately Stressful Environment" and three for "Limited Support in Environment," three for "Moderate or Equivocal Resilience and/or Response to Service," and three for "Child's Limited Involvement in Services" and two for "Parent's Adequate Involvement in Services." Plaintiffs argued for a four rating for serious risk of harm, automatically requiring Level Five care, because M.M. "provided significant detail during his confessions on suicidal ideation and the actions he would proceed with." However, the medical records repeatedly note that M.M. did not have a plan or intent. In the days and weeks after M.M. provided more detail than usual to his therapist about his suicidal ideation on

14

February 25, 2020, the medical records do not indicate any follow-up concern by staff or his parents.

Plaintiffs also argued that M.M. should have received a four rating for serious functional impairment, again requiring Level Five care, because his "ADHD, OCD and Autism had led to his failure and absence in numerous classes, which led to his withdrawal from" M.M.'s previous boarding school. The relevant anchor point for serious functional impairment specifies that the "[i]nability to perform adequately" refers to performance issues "even in a specialized school setting," not a mainstream boarding school like the one M.M. had attended prior to Daniels Academy. As with his time at Elevations, M.M.'s "major co-occurrence of conditions" characterization fails because it was reasonable for Defendants to find that neither ADHD nor OCD appear to have "seriously" impaired M.M.'s recovery, as required for Level Five care, rather than presenting only as "moderately debilitating" symptoms that "adversely affect the presenting problem" of his autism spectrum disorder.

For all of these reasons, it was not arbitrary and capricious for Defendants to conclude that M.M.'s treatment at Elevations and Daniels Academy for the uncovered periods failed to meet the Plan's medical necessity requirement.

### B.  Parity Act Claim (Count II)

The Complaint alleges that Defendants violated the Parity Act, "because the internal guidelines they relied on to determine M.M.'s residential mental health treatment was not medically necessary are more restrictive than the internal guidelines Defendants apply to analogous medical/surgical care." *See* 29 CFR § 2590.712(c)(4)(i). The internal guidelines that Plaintiffs challenge are the Optum Guidelines Defendants relied on in the first-level appeal pre-remand decisions. Summary judgment is granted to Defendants on this claim because Plaintiffs

lack constitutional standing to bring the claim.

### 1. The Parity Act

The Parity Act, which regulates health plans that cover both "medical and surgical benefits" on the one hand and "mental health or substance use disorder benefits" on the other, requires that the treatment limitations applicable to mental health benefits be "no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan" and that there be "no separate treatment limitations that are applicable only with respect to mental health" benefits. 29 U.S.C. § 1185a(a)(3)(A). "Congress enacted the [Parity Act] to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans." *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 356 (2d Cir. 2016). "Although there is no private right of action under the Parity Act, portions of that law are incorporated into ERISA and may be enforced using the civil enforcement provisions in ERISA § 502." *Munnelly*, 316 F. Supp. 3d at 728.

### 2. Standing

Plaintiffs lack standing because they have failed to show that they suffered any injury from the alleged Parity Act violation. Article III of the Constitution confines federal courts' jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case -- in other words, standing." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). "A plaintiff establishes Article III standing by demonstrating (1) an injury in fact that is (2) fairly traceable to the challenged action of the defendant and is (3) likely to be redressed by a favorable decision." *Barrows v. Becerra*, 24 F.4th 116, 127 (2d Cir. 2022) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

The Parity Act claim challenges exclusively the Optum Guidelines. But those guidelines were not used in the final appeals on remand to United or the Benefits Committee. As discussed at length above, Defendants used CASII to affirm the denial of coverage on remand. Even if the Optum Guidelines violated the Parity Act (but not addressing or deciding that issue), that violation did not injure Plaintiffs because the ultimate denial of benefits was based on the CASII guidelines, which are not challenged. Plaintiffs lack standing to bring their Parity Act claim. *See, e.g.*, *Brian J. v. United Healthcare Ins. Co.*, No. 4:21 Civ. 42, 2023 WL 2743097, at *8 (D. Utah Mar. 31, 2023) (finding plaintiffs lacked standing to raise Parity Act challenge because ruling on disparity would not redress plaintiffs' injury).

The Parity Act claim is dismissed for lack of standing for the additional reason that it is deemed conceded; Plaintiffs did not respond to Defendants' standing argument but addressed only the merits of the claim. *Cf. Jackson v. Fed. Exp.*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims.").

### III.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED** and Plaintiffs' motion for summary judgment and request for oral argument are **DENIED** as moot.

The Clerk of Court is respectfully directed to close the motions at Dkts. 59, 60, 63 and 73 and to close the case.

Dated: September 29, 2023
    New York, New York

_____
**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**